COMMONWEALTH vs. EDWARD H. HUGHES.

Berkshire. February 5, 1980. — May 5, 1980.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, LIACOS, JJ.

*Constitutional Law*, Search and seizure, Self-incrimination. *Firearms. Evidence*, Firearm. *Practice, Criminal*, Discovery.

A judge's order that a defendant produce a described revolver for examination by the Commonwealth did not violate the defendant's rights under the Fourth Amendment to the United States Constitution. [586-587]

A judge erred in ordering a defendant indicted on two counts of assault by means of a dangerous weapon, to wit, a pistol, to produce a described revolver which he had previously registered with the Department of Public Safety pursuant to G. L. c. 140, § 128B; the order effectively compelled implicit statements as to the existence, location, and control of the gun in violation of the defendant's rights under the Fifth Amendment to the United States Constitution. [587-595]

INDICTMENT found and returned in the Superior Court Department on October 4, 1978.

A proceeding for contempt, commenced on August 21, 1979, was heard by *Simons*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Leonard H. Cohen (David O. Burbank* with him) for the defendant.

*Daniel A. Ford*, Assistant District Attorney (*Anthony J. Ruberto, Jr.*, District Attorney, with him) for the Commonwealth.

KAPLAN, J. A Berkshire County grand jury on October 4, 1978, indicted the defendant Edward H. Hughes on two counts of assault by means of a dangerous weapon, to wit, a pistol (G. L. c. 265, § 15B). The charges arose from an incident in Otis, Massachusetts, on June 21, 1978, when the defendant allegedly assaulted John Joyner and Leonard Ter-

ranova by firing two rounds through the front windshield of a truck in which the men were sitting.[1]  Inspection of a recovered bullet suggested that it came from either a .38 caliber or .357 magnum handgun.  On June 22, 1978, the Otis chief of police asked the defendant whether he owned either kind of gun and, if so, whether he would surrender it voluntarily for examination.  The defendant produced a .357 magnum pistol.  Tests showed it had not been recently fired.  The defendant refused consent to a search of his car, which was impounded at the time, for any additional weapon.  However, the police on June 22 obtained a warrant for search of the car for "[e]ither a 38 calibre or 357 Magnum pistol and spent shells from either."  Police executed the warrant that day and made the return: "Nothing pertaining to warrant found."

The defendant pleaded not guilty on October 10, 1978, and was released on personal recognizance.  Customary defense motions followed.  On March 28, 1979, the Commonwealth filed a "Motion to Order Defendant to Produce Weapon" for ballistics examination.  The weapon was described in the motion as a "Smith and Wesson .38 Caliber Revolver Serial Number J354354."  An accompanying affidavit stated that the defendant had registered the revolver with the firearms identification division of the Department of Public Safety.  This was apparently under G. L. c. 140, § 128B; and we note that pursuant to § 129C such a registrant must report to the division any sale, gift, or other transfer of possession of the weapon; failure to do so is criminally punishable (G. L. c. 269, § 10 [h]).  The motion was allowed after hearing: the defendant was ordered to produce the described revolver within ten days; the Commonwealth was ordered to give the defendant a copy of any ballistics test results within ten days of receiving them; and "[a]ny question concerning the admissibility of evidence emanat-

---

[1] These circumstances appear from an affidavit supporting an application for a search warrant which is added to the appellate record by consent of the parties.

ing from the allowance of this motion is deferred to the trial justice, if appropriately raised."

The defendant attempted to secure immediate review of the order by applying to a single justice of this court to exercise our supervisory power, G. L. c. 211, §§ 3 and 4A, claiming that the judge's order, if enforced, would violate his constitutional privilege against self-incrimination.[2] The single justice denied the application on July 6, 1979, observing that regular review could be had on an appeal from an adjudication of contempt for failure to comply with the order, or, if the indictments went to trial, then on appeal from a judgment of conviction, with error claimed in the trial judge's refusal to exclude the gun "and all evidence derived from the production thereof."

On July 27, 1979, the Commonwealth demanded by registered letter that the defendant turn over the gun within twenty-four hours or face contempt charges. On the defendant's failure to reply, the Commonwealth on August 21, 1979, instituted proceedings for contempt which were brought to hearing on August 30. A representative of the firearms identification division testified that on March 23, 1976 (twenty-seven months before the alleged assault) the defendant had registered the gun described, and had not since then filed any report of transfer of the gun. In his findings, ruling, and order of August 30, 1979, the judge found that the defendant had purchased the revolver on March 23, 1976, and had not filed any further report. The

---

[2] The Commonwealth has not argued that the defendant's voluntary surrender of one gun waived any Fifth Amendment rights he might have to refuse surrender of another. Cf. *Rogers* v. *United States*, 340 U.S. 367, 373 (1951). See generally Note, Testimonial Waiver of the Privilege Against Self-Incrimination, 92 Harv. L. Rev. 1752 (1979). Nor is it argued that the defendant's alleged possession of the gun is other than personal. Cf. *Bellis* v. *United States*, 417 U.S. 85 (1974) (no Fifth Amendment privilege available to person holding records of dissolved three-person partnership); *United States* v. *White*, 322 U.S. 694 (1944) (same for assistant supervisor subpoenaed by grand jury to produce union records); *Dreier* v. *United States*, 221 U.S. 394 (1911) (same for subpoena issued to officer of corporation demanding production of corporate records in his custody).

defendant was held in contempt but given until 3 P.M. that day to produce the weapon or show present inability to do so, otherwise he would be incarcerated until purgation or further order of the court. Sentence being stayed by the judge, the parties applied jointly for direct appellate review, which we allowed. We reverse.

1. *The Fourth Amendment question.* The defendant's contention, as expressed in the court below and in the joint application to this court, rested on the Fifth Amendment. But he now ventures to say in a footnote in his brief that the order "may . . . have . . . violated" his right under the Fourth Amendment[3] to be free of unreasonable searches and seizures, for it sought, he suggests, "to probe the Defendant's *mind*" which is "per se unreasonable." (Defendant's emphasis.) There are no supporting citations. We deal with the Fourth Amendment only to indicate that it may be put to one side in the present case.

A person may complain of a search warrant, and thus of the seizure of material obtained by the search, on the ground that the warrant was issued without probable cause or was indefinite, obscure, or overly broad in its description of the things to be taken or the place to be searched. A warrant defective in any such respect would lead to a search or seizure unreasonable in the sense of entailing an undue invasion of personal privacy by government agents. This is the familiar terrain of the Fourth Amendment. Of course, if objections of this order fail, material may be brought in and used that may be, and usually is, of an incriminating character, but the person involved has not been required to assist in the production.

In the present case of a motion addressed to a person to produce a physical object (similar to a subpoena duces

---

[3] Of course these Amendments bear on the States through the Fourteenth Amendment. See *Malloy* v. *Hogan*, 378 U.S. 1 (1964) (Fifth Amendment); *Mapp* v. *Ohio*, 367 U.S. 643 (1961) (Fourth Amendment exclusionary rule). Also involved are the corresponding provisions of the Constitution of the Commonwealth, art. 12 of the Declaration of Rights. As to self-incrimination: "No subject shall . . . be compelled to accuse, or furnish evidence against himself."

tecum) the objection is not that there is lack of cause for seeking the production — i.e., that the investigatory effort is illegal — or that the object sought is irrelevant to the inquiry or is insufficiently described.[4] Rather the objection is, precisely, that the defendant's assistance is demanded — assistance in a testimonial sense. That is what the defendant means by "mind probe." He is required under the order himself to produce the gun and thereby, he argues, make a series of important avowals with an incriminating tendency (discussed particularly in our point 2 below), or to explain his inability to comply. So the grievance, if there is one, fits under the Fifth Amendment, not the Fourth.

There are situations of subtle interaction between the Fourth and Fifth Amendments, for example, where the very object sought is a "speaking" object, say a statement, voluntarily written, which tends by its internal content to incriminate the writer, who is the person ordered to produce the writing. See generally *Couch* v. *United States*, 409 U.S. 322, 338-339 (1973) (Douglas, J., dissenting); Note, Papers, Privacy and the Fourth and Fifth Amendments: A Constitutional Analysis, 69 Nw. U.L. Rev. 626 (1974). A consideration of the exact bearing of the two Amendments on such problems would involve us in an analysis of difficult authority from *Boyd* v. *United States*, 116 U.S. 616 (1886), through *Andresen* v. *Maryland*, 427 U.S. 463 (1976).[5] We are confronted with no such problem here.

2. *Fifth Amendment analysis.* So the defendant must justify what would otherwise be contumacy by reference to his privilege not to be "compelled . . . to be a witness against

---

[4] A claim of indefiniteness or the like would invoke protections deriving from the Fourth Amendment. See *Fisher* v. *United States*, 425 U.S. 391, 401 (1976); *Oklahoma Press Publishing Co.* v. *Walling*, 327 U.S. 186, 208-209 (1946).

[5] For a summary of the case law and suggested interpretations, see Note, Formalism, Legal Realism and Constitutionally Protected Privacy Under the Fourth and Fifth Amendments, 90 Harv. L. Rev. 945 (1977); Note, The Life and Times of *Boyd* v. *United States* (1886-1976), 76 Mich. L. Rev. 184 (1977); Ritchie, Compulsion that Violates the Fifth Amendment: The Burger Court's Definition, 61 Minn. L. Rev. 383 (1977).

himself" (or the counterpart State constitutional provision). But in the present case we do not have the prototypical compelled oral testimony. Under compulsion of the order the defendant could produce the weapon without uttering a word.

In one sense the distinction between the two forms of production — a statement in audible prose and an implicit statement — appears to be of no consequence because the protection of the privilege extends to "an accused's communications, whatever form they might take." *Schmerber* v. *California*, 384 U.S. 757, 763-764 (1966). See *United States* v. *White*, 322 U.S. 694, 699 (1944); McCormick, Evidence § 126, at 268 n.73 (2d ed. 1972). In another sense the distinction may be crucial since "the Fifth Amendment does not independently proscribe the compelled production of every sort of incriminating evidence but applies only when the accused is compelled to make a *testimonial* communication that is incriminating." *Fisher* v. *United States*, 425 U.S. 391, 408 (1976) (emphasis in original). See *United States* v. *Wade*, 388 U.S. 218, 222 (1967).

The upshot is that we have to say here whether the defendant's producing the revolver would have sufficient testimonial aspects to initiate Fifth Amendment consideration and whether in those aspects there can be found a tendency to incriminate him. "These questions perhaps do not lend themselves to categorical answers; their resolution may instead depend on the facts and circumstances of particular cases or classes thereof." *Fisher* v. *United States, supra* at 410. But for guidance we look primarily to *Schmerber* and *Fisher*.

In *Schmerber* the Supreme Court upheld against constitutional attack the use as evidence, in a prosecution for drunken driving, of laboratory analysis of a blood sample taken from the defendant against his will. Although the submission to the physical act was involuntary, and the test results incriminating, there was, according to the Court, "[n]ot even a shadow of testimonial compulsion upon or enforced communication by the accused." 384 U.S. at 765. Rather the defendant was merely "the source of 'real or

physical evidence'"; "his participation, except as a donor, was irrelevant to the results of the test." *Id.* at 764-765.

Later cases applied the *Schmerber* reasoning to uphold the forcing of voice exemplars (*United States* v. *Wade*, 388 U.S. 218 [1967]), handwriting samples (*Gilbert* v. *California*, 388 U.S. 263 [1967]), fingerprints (*Snow* v. *Oklahoma*, 489 F.2d 278 [10th Cir. 1973]), and other things. These cases conceived that in each instance the accused was used as an object on which various tests were performed; he was not required "to disclose any knowledge he might have." *United States* v. *Wade, supra* at 222. See 8 J. Wigmore, Evidence § 2264 (McNaughton rev. 1961). Cf. *United States* v. *Mara*, 410 U.S. 19, 37 (1973) (Marshall, J., dissenting).

*Fisher* took up the *Schmerber* analysis to see where it led in a case of production of documents compelled from one other than the writer.[6] The I.R.S., after interviewing certain taxpayers regarding possible civil or criminal infractions of the tax laws, learned that these persons had retrieved some of their accountants' work papers (which laid out analyses of the taxpayers' income and disbursements related to the years under investigation), and had passed the papers to their attorneys. Summons was then served on the attorneys to produce the work sheets. The issue reduced to whether the taxpayers themselves had a Fifth Amendment privilege to refuse production of the papers.[7] On the particular facts, the Court held against the taxpayers.

The Court recognized that two kinds of testimonial assertions were implied in the production. First, "producing the documents tacitly admits their existence and their location

---

[6] Hence the "speaking document" problem earlier mentioned did not arise. See *Fisher* v. *United States, supra* at 409, 414.

[7] The Court first stated that the attorney could not assert the client's (taxpayer's) Fifth Amendment privilege; but as the client had passed the documents to the attorney in a privileged transaction, it was disposed to analyze the case as if the client had never made the transfer. See *Fisher* v. *United States, supra* at 396-405. (The Court analyzed two cases presenting essentially identical facts, one from the Third Circuit, the other from the Fifth Circuit.)

in the hands of their possessor." *Fisher*, 425 U.S. at 411-412. Second, the production implicitly authenticated the papers as being those requested in the summons. *Id.* See *People* v. *Defore*, 242 N.Y. 13, 27 (1926) (Cardozo, J.). Why, then, was the claim of privilege denied? The elements of existence, location, and control of the papers were "not in issue"; "[t]he existence and location of the papers are a foregone conclusion and the taxpayer adds little or nothing to the sum total of the Government's information by conceding that he in fact has the papers." 425 U.S. at 411. The information added was trivial. In the circumstances, existence and location of the papers were comparable to the existence and location of the blood extracted in *Schmerber*. Coming to the element of authentication, the Court said that, while testimonial, it did not incriminate the taxpayer: the implicit assertion that the papers produced conformed to the summons would not serve to authenticate them at trial; it was the testimony of the accountants that would do that. Nor was the government using the taxpayer's "authentication" to prove that the figures were accurate. *Id.* at 413.

The converse inference from *Fisher*, as indicated by the Court,[8] is that assertions implied from production of things (whether or not documents) are within the Fifth Amendment, and thus justify the refusal to produce, when they are nontrivial and incriminating. Remitting to a footnote cases that do not directly test this inference — cases like *Fisher* on their facts, and so requiring the production[9] — we cite recent decisions which verify the inference and illustrate it. As for the implicit admission of existence, location, or control, even before *Fisher* the Seventh Circuit in *United States* v. *Campos-Serrano*, 430 F.2d 173 (1970), reversed a convic-

---

[8] "The act of producing evidence in response to a subpoena nevertheless has communicative aspects of its own, wholly aside from the contents of the paper produced. Compliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by the taxpayer. It also would indicate the taxpayer's belief that the papers are those described in the subpoena." *Fisher* v. *United States, supra* at 410.

[9] See, e.g., *United States* v. *Osborn*, 561 F.2d 1334 (9th Cir. 1977); *United States* v. *Friedman*, 593 F.2d 109 (9th Cir. 1979).

tion for knowing possession of a forged alien registration receipt card where the defendant had been coerced into producing it during a custodial interrogation: "An individual should not be compelled to produce the crime itself." *Id*. at 176. In *State* v. *Dennis*, 16 Wash. App. 417 (1976), decided after *Fisher*, the court reversed a conviction of possession of cocaine where a policeman had harassed the defendant into producing bags of the drug from his refrigerator, thus virtually admitting control. *Id*. at 423. In both *Campos-Serrano* and *Dennis* the testimonial propositions were not "foregone conclusions" although the investigating officers had some reason to think they were true; and the element of incrimination was present.[10] Similarly in *In re Grand Jury Subpoena Duces Tecum*, 466 F. Supp. 325 (S.D.N.Y. 1979), the government, having ground to suspect that the accused had made illegal payments to some union officials, tried to have the accused condemn himself by answering to a subpoena for records of his financial transactions with these people. The subpoena was ordered quashed. And in *State* v. *Alexander*, 281 N.W.2d 349, 352 (Minn. 1979), the court reversed a contempt adjudication which had been based on the defendant's failure to produce film, supposed to be in his possession, and claimed to be in violation of an obscenity statute. Here production "would, in effect, be an admission of [defendant's] control or possession of the film."

In *In re Bernstein*, 425 F. Supp. 37 (S.D. Fla. 1977), the court spoke in terms of "authentication" through compelled production offensive to the principle drawn from *Fisher*: the accused was being subpoenaed to produce self-incriminating tape recordings. On the same ground, *United States* v. *Plesons*, 560 F.2d 890, 892 (8th Cir. 1977), recognized the Fifth Amendment privilege of a doctor under grand jury investigation to refuse to produce patient records that might

[10] We would see no distinction of constitutional dimension between production of what might be called the corpus delicti and production of a thing which was a step or two distant but was nevertheless incriminating. Cf. *Murphy* v. *Commonwealth*, 354 Mass. 81, 83-84 (1968).

assist the government in convicting him of illegally dispensing narcotics (it was finally held, however, that the surrender of the records had been voluntary).

The present case is consonant with those just cited. If the defendant should produce the revolver, he would be making implicitly a statement about its existence, location, and control to which the Commonwealth says it would allude at trial to show he had possession and control at some point after the alleged crime. The implied statement would also function as an authentication. See *Curcio* v. *United States*, 354 U.S. 118, 125 (1957); 8 J. Wigmore, *supra* at § 2264, at 380. But see Friendly, The Fifth Amendment Tomorrow: The Case for Constitutional Change, 37 U. Cin. L. Rev. 671, 702 (1968) (criticizing implicit authentication rationale). Nor would the statement amount to a "foregone conclusion" conveying merely trivial new knowledge. On the contrary, it would deal with just those matters about which the Commonwealth desires but does not have solid information. A search warrant has proved futile. Apparently the Commonwealth does not know whether the gun exists or, if it does, where it is being kept; it has only some evidence to base a suspicion that the defendant may be able to produce it, if he will. In the language of the cases, the Commonwealth is seeking to be relieved of its ignorance or uncertainty by trying to get itself "informed of knowledge the defendant possesses." *People ex rel. Bowman* v. *Woodward*, 63 Ill. 2d 382, 387 (1976).[11]

---

[11] Our analysis is consistent with *Williams* v. *Florida*, 399 U.S. 78 (1970), which upheld against Fifth Amendment attack a Florida rule requiring disclosure by the defendant of the identity of alibi witnesses he intends to call (the government then reciprocally discloses the names of its rebuttal witnesses). The Court said: "Nothing in [the] rule requires the defendant to rely on an alibi or prevents him from abandoning the defense; these matters are left to his unfettered choice," and that "[a]t most, the rule only compelled petitioner to accelerate the timing of his disclosure." *Id.* at 84-85. We upheld a similar notice-of-alibi rule in *Commonwealth* v. *Edgerly*, 372 Mass. 337 (1977) (reserving the question of permissible sanctions for failure to give notice of alibi defense). Under *Blaisdell* v. *Commonwealth*, 372 Mass. 753 (1977), a defendant claiming lack of criminal responsibility may be compelled to undergo psychiatric examina-

The avowals sought from the defendant are not only significant but must be taken to be incriminating. The revolver is the supposed instrumentality of the crime, and control or possession after the event, taken together with the earlier ownership attested by the registration, would tend to establish possession at the critical time. It is partially on this declared theory that the Commonwealth has pursued the defendant with its motion to produce. The Commonwealth states that once it has the revolver in hand, it will run ballistics tests, and these may lead to expert testimony, of whatever strength, tying the revolver to the actual assault. This is a step beyond the production sought, but the constitutional privilege "does not merely encompass evidence which may lead to criminal conviction, but includes information which would furnish a link in the chain of evidence that could lead to prosecution . . . ." *Maness* v. *Meyers*, 419 U.S. 449, 461 (1975). See *Taylor* v. *Commonwealth*, 369 Mass. 183, 187-188 (1975); *Hoffman* v. *United States*, 341 U.S. 479, 488 (1951). In reviewing the contempt adjudication, it is right to assume, as the defendant does arguendo in his brief, that he has present possession of the registered gun, which makes very real the factor of self-incrimination that is involved.[12] Cf. *Commonwealth* v. *Kreplick*, 379 Mass. 494 (1980).

By way of rebuttal the Commonwealth appears to be making the argument that the defendant may properly be ordered to produce the gun because — so it claims — enough independent evidence already is available against him to prove beyond a reasonable doubt that he had the gun on the date of the alleged offense. The Commonwealth does not simply assert that the evidence to be gained by pro-

---

tion but this may be required only where on his part he intends to present expert testimony depending in whole or part on voluntary interview between the psychiatrist and himself; a concept of waiver is involved. In the present case the defendant has no plan to introduce the gun at trial in his own defense; there is not a mere acceleration of disclosure, or a question of waiver.

[12][We also note that if Hughes failed to produce the gun on request, he might be criminally liable under G. L. c. 269, § 10 (*h*).

duction is here inconsequential or nonincriminating; rather it says that the evidence is unworthy of Fifth Amendment protection because it merely enhances other persuasive evidence obtained without the defendant's help. The Commonwealth's argument is indeed curious. It is as if we were asked to rule that a confession could be coerced from an accused as soon as the government announced (or was able to show) that at a future trial it could produce enough independent evidence to get past a motion for a directed verdict of acquittal. This would be to encourage present infringements of the Constitution on the excuse that they might or would be held "harmless" after trial and conviction.

The Commonwealth has not attempted to eliminate, as far as it could, the testimonial aspects of the defendant's producing the gun, by the expedient of undertaking that at trial it would authenticate the gun simply by the serial number (if that number appears), and would make no tender in the court room of the fact that it was the defendant who produced the gun. We go no further than to express doubt whether the case would have been materially altered by an offer of such an undertaking in the court below. Compare *United States* v. *Authement*, 607 F.2d 1129 (5th Cir. 1979) (per curiam), with *In re Grand Jury Subpoena Duces Tecum*, 466 F. Supp. 325, 327 (S.D.N.Y. 1979); Berger, The Unprivileged Status of the Fifth Amendment Privilege, 15 Am. Crim. L. Rev. 191, 219-220, 222 (1978); Note, Formalism, Legal Realism, and Constitutionally Protected Privacy Under the Fourth and Fifth Amendments, 90 Harv. L. Rev. 945, 979, 987-988 (1977). Implicit statements as to existence, location, and control would nevertheless have been compelled and the information would have been delivered over to the Commonwealth. The Commonwealth could use such information, mediately, to secure other incriminating evidence to put before the jury, and it can be assumed that the testimonial statement as to the location of the gun would be used, mediately, to lead to ballistics tests and ballistics evidence and an opinion thereon. There is no resemblance here to *Schmerber* where location was a foregone

conclusion. More generally, we express doubt whether a defendant may be compelled to deliver the corpus delicti, which may then be introduced by the government at trial, if only it is understood that the facts as to the source of the thing are withheld from the jury.

The conclusion we reach in this case follows from basic policies supporting the constitutional guaranty. As was said in *Couch* v. *United States*, 409 U.S. 322, 328 (1973), "[i]t is extortion of information from the accused himself that offends our sense of justice." And again: "our sense of fair play . . . dictates 'a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load,' 8 Wigmore, Evidence (McNaughton rev., 1961), 317." *Murphy* v. *Waterfront Comm'n*, 378 U.S. 52, 55 (1964). Our result, were it not dictated, as we think it is, by the Fifth Amendment, would in our view be required by the rather clearer terms of the Constitution of the Commonwealth (see n.3). See especially *Emery's Case*, 107 Mass. 172, 182 (1871).

The order directing the defendant to produce, and the subsequent order adjudging him in contempt, were in error and are vacated.

*So ordered.*