[Civ. No. 23349. Third Dist. Feb. 21, 1984.]

DANIEL SIGMUND GOLDSMITH, Petitioner, v.
THE SUPERIOR COURT OF SHASTA COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Leep, Asbill & Tescher and M. K. Tescher, Jr., for Petitioner.

No appearance for Respondent.

John K. Van de Kamp, Attorney General, Willard J. Jones and William G. Prahl, Deputy Attorneys General, for Real Party in Interest.

## OPINION

**SPARKS, J.**—The issue in this writ proceeding is whether the trial court can lawfully make a discovery order compelling defendant to turn over to the prosecution a weapon he allegedly used to commit the offenses charged. We hold that the trial court may not order such production because there is no legislative authorization for the compelled disclosure and, more fundamentally, because it would violate defendant's constitutional privilege against self-incrimination.

I

Petitioner Daniel Goldsmith stands charged by an information with three felony counts. Count I charges him with the attempted murder of Keith Johnson (Pen. Code, §§ 664/187)[1], with the further allegations that he used a firearm, namely, a "9mm automatic," in the commission of that offense within the meaning of section 12022.5 and that he intentionally inflicted great bodily injury upon Mr. Johnson within the meaning of section 12022.7. Count II charges him with shooting at an occupied motor vehicle (§ 246). Finally, count III charges him with a felonious assault upon Peggy Johnson (§ 245, subd. (a)), with the further allegation that he used the "9mm automatic" firearm in the commission of the assault within the meaning of section 12022.5.

On September 16, 1983, the prosecution moved for pretrial discovery, requesting among other things that defendant and/or his attorney produce for inspection and testing the weapon defendant was alleged to have used, namely, the 9mm pistol. The basis of this discovery request was the unsworn statement of a deputy district attorney claiming that police reports, witness interviews and the testimony at the preliminary examination "demonstrate" that defendant "has had the weapon . . . in his personal possession, and continues to be in actual or constructive possession thereof, or has first hand knowledge of its location." Following a hearing on the issue, the court ordered defendant and/or his attorney to produce the weapon by

---

[1]Unless otherwise indicated, all subsequent statutory references are to the Penal Code.

September 28, 1983, or to show cause why they had not complied with the order.

By September 28, 1983, the weapon had not been produced and, after an *in camera* hearing[2] requested by defendant's counsel, the court "found that no justifiable reasons have been given for their refusal to produce the weapon . . . ." The court then issued this order imposing sanctions:

"1. at the trial the defendant will not be permitted to introduce any proffered evidence to establish that the 9mm automatic pistol, further identified as a Smith and Wesson, model 59, serial #A399883, was *not* the firearm used in the commission or attempted commission of the offenses charged in the information or was *not* an operable firearm at the time the charged offenses are alleged to have occurred; and

"2. at trial the defendant will not be permitted to introduce any proffered evidence the trial court finds plaintiff may have reasonably rebutted if given the opportunity to inspect, examine and test the pistol before trial." (Italics in original.)

Defendant sought relief in this court by filing a petition for a writ of mandate. We stayed trial pending further order of this court.

## II

In *People* v. *Collie* (1981) 30 Cal.3d 43, 48 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776], the California Supreme Court expressly "disapprove[d] of any compelled production of defense evidence absent explicit legislative authorization."[3] No legislative authorization exists for the compelled discovery of the defense evidence involved here. (Cf. § 1102.5.) The

---

[2]At this hearing defense counsel represented to the court that he neither possessed the gun nor had control over it. Counsel respectfully declined, on grounds of attorney-client privilege, to reveal whether he knew where the gun was. In *People* v. *Meredith* (1981) 29 Cal.3d 682, 695 [175 Cal.Rptr. 612, 631 P.2d 46], the court held that whenever defense counsel removes or alters evidence, the attorney-client privilege does not bar revelation of the original location or condition of the evidence. Nothing in the record in this case suggests that counsel ever removed, altered or otherwise interfered with the prosecution's opportunity to discover the gun. The *Meredith* holding consequently has no application here.

[3]Of course, *People* v. *Collie, supra,* 30 Cal.3d 43, left undisturbed that line of cases exempting from the privilege against self-incrimination such evidence as fingerprints, blood samples, breath samples, appearances in lineups, and handwriting and voice exemplars, as well as physical evidence altered or removed by defense counsel or his investigator. (*Id.,* at pp. 55-56, fn. 7.)

trial court consequently erred in granting this unauthorized motion for production of the weapon.

■ More fundamentally, however, the privilege against self-incrimination, mandated by both the California and United States Constitutions,[4] prohibits the type of compelled discovery ordered in this case.

The California Supreme Court had occasion, in *People* v. *Schader* (1969) 71 Cal.2d 761 [80 Cal.Rptr. 1, 457 P.2d 841], to analyze the policy which underlies the privilege against self-incrimination and recognized, ". . . with the United States Supreme Court, 'that the American system of criminal prosecution is accusatorial, not inquisitorial, and that the Fifth Amendment privilege is its essential mainstay. . . . Governments, state and federal, are thus constitutionally compelled to establish guilt by evidence independently and freely secured, and may not by coercion prove a charge against the accused out of his own mouth.' [Citation.] The People must 'shoulder the entire load' of their burden of proof in their case in chief, without assistance either from the defendant's silence or from his compelled testimony. [Citations]." (*Id.*, at p. 770.)

The question here is whether the compelled production of the gun constitutes the type of incriminating testimonial communication barred by the privilege against self-incrimination. The Supreme Judicial Court of Massachusetts addressed this precise issue in *Commonwealth* v. *Hughes* (1980) 380 Mass. 583 [404 N.E.2d 1239], cert. den. 449 U.S. 900 [66 L.Ed.2d 129, 101 S.Ct. 1269]. That court relied primarily upon federal authority in holding that an order compelling defendant to produce a pistol allegedly used in two charged assaults violated the Fifth Amendment privilege against self-incrimination.[5] (*Id.*, at p. 1246.) The opinion, a fine piece of judicial

---

[4]The privilege against self-incrimination of the California Constitution is found in article I, section 15, which reads in pertinent part: "Persons may not . . . be compelled in a criminal cause to be a witness against themselves. . . ." The analogous provision of the federal Constitution is found in the Fifth Amendment, which reads in pertinent part: "No person . . . shall be compelled in any criminal case to be a witness against himself. . . ." The Fifth Amendment privilege against self-incrimination is applicable to the states by virtue of the Fourteenth Amendment. (*Malloy* v. *Hogan* (1964) 378 U.S. 1 [12 L.Ed.2d 653, 84 S.Ct. 1489].)

[5]The important facts of *Commonwealth* v. *Hughes, supra,* 380 Mass. 583 [404 N.E.2d 1239], may be summarized as follows: Defendant Hughes was charged with assault by means of a dangerous weapon. Police obtained a warrant to search defendant's car for the pistol suspected to have been used in the assault and for spent shells. Police executed the warrant and turned up nothing. After defendant pled not guilty, the commonwealth filed a "Motion to Order Defendant to Produce Weapon" for ballistic examination. The weapon described in the motion had been registered under defendant's name. The motion was allowed and defendant was ordered to produce the pistol within 10 days. The order noted that "[a]ny question concerning the admissibility of evidence emanating from the allowance of this

craftsmanship, dealing with a not so simple question, will be quoted extensively in the discussion to follow.

Much of the constitutional discussion forming the foundation for the *Hughes* holding was reiterated by our Supreme Court in *People* v. *Rucker* (1980) 26 Cal.3d 368, 378-386 [162 Cal.Rptr. 13, 605 P.2d 843].[6] In deference to our high court, we quote *Rucker* where the opinions overlap.

*Rucker* begins: "The privilege [against self-incrimination] is an express mandate of both the California and United States Constitutions. It protects an individual from being compelled to provide 'testimonial' evidence which may tend to incriminate him. As a corollary, the privilege precludes the government from using such evidence or its fruits in a criminal proceeding. [Citation.]" (*Id.*, at p. 378, fn. omitted.)

The *Rucker* court then noted that the privilege may be invoked in any setting, including when prosecution seeks discovery against a criminal defendant, and that judicial review of an asserted invasion of the privilege has traditionally focused on whether the claimant was (1) actually *compelled* to disclose (2) *testimonial* communications (3) which tended to incriminate him. (*Id.*, at pp. 378, 379, fn. 8.) As the court had earlier noted in *Prudhomme* v. *Superior Court* (1970) 2 Cal.3d 320, 326 [85 Cal.Rptr. 129, 466 P.2d 673], in the special circumstance of prosecutorial discovery, "the privilege [against self-incrimination] forbids compelled disclosures which could serve as a 'link in a chain' of evidence tending to establish guilt of a criminal offense; in ruling upon a claim of privilege, the trial court must find that it clearly appears from a consideration of all the circumstances in the case that an answer to the challenged [request] cannot possibly have a tendency to incriminate the witness." (See also *Reynolds* v. *Superior Court* (1974) 12 Cal.3d 834, 839 [117 Cal.Rptr. 437, 528 P.2d 45]; *People* v. *Rucker, supra,* 26 Cal.3d at p. 379, fn. 8; *Maness* v. *Meyers* (1975) 419 U.S. 449, 461 [42 L.Ed.2d 574, 584, 95 S.Ct. 592] and *Hoffman* v. *United States* (1951) 341 U.S. 479, 488 [95 L.Ed. 1118, 1125, 71 S.Ct. 814].)

This case shares with *Hughes* what the Massachusetts court described as a departure from the prototypical case of compelled oral testimony. Both

---

motion is deferred to the trial justice." Defendant sought immediate review of the order and was refused. Defendant did not produce the pistol and was held in contempt. Defendant's sentence was stayed pending direct review by the Supreme Judicial Court of Massachusetts.

[6]*People* v. *Rucker, supra,* 26 Cal.3d 368, held that the trial court erred in permitting the prosecution to introduce on rebuttal two pretrial interviews with defendant obtained in violation of the safeguards enunciated in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602], for the purpose of proving defendant lacked diminished capacity.

petitioner and Hughes could have complied with the ordered production of the weapon without uttering a word. (*Com.* v. *Hughes, supra,* 404 N.E.2d at p. 1242.) The nonverbal character of the compelled disclosure poses a threshold issue because " 'the Fifth Amendment does not independently proscribe the compelled production of every sort of incriminating evidence but applies only when the accused is compelled to make a *testimonial* communication that is incriminating.' [Citation.]" (*Id.,* at p. 1242.)

We are therefore required, as was the court in *Hughes,* to decide whether the compelled act of producing the weapon has sufficient testimonial aspects to permit Fifth Amendment consideration. If we determine there are testimonial aspects to the ordered production then we must consider whether those aspects have an incriminating tendency. (*Com.* v. *Hughes, supra,* 404 N.E.2d at p. 1242; see *Prudhomme* v. *Superior Court, supra,* 2 Cal.3d at p. 326.)

The discussions in *Rucker* and *Hughes* concerning what constitutes testimonial evidence roughly parallel each other. *Rucker* summarizes the law: "In the benchmark decision of *Schmerber* v. *California* [1966] 384 U.S. 757 [16 L.Ed.2d 908, 86 S.Ct. 1826], no violation of the federal privilege was found in a compelled blood-alcohol test, the results of which were to be used in a prosecution for driving under the influence of alcohol. The court noted that the testimonial component of the privilege 'reaches an accused's communications, whatever form they might take, and the compulsion of responses that are also communications. . . .' [Citation.] However, the procedure to extract the blood did not involve 'even a shadow of testimonial compulsion . . . or enforced communication. . . .' [Citation.] The court noted that the accused's 'participation, except as a donor, was irrelevant to the results of the test, which depend on chemical analysis and on that alone.' [Citation.]

"Almost six months after *Schmerber,* this court held that an accused had no privilege to refuse to participate in a voice identification procedure. (*People* v. *Ellis* [1966] 65 Cal.2d 529 [55 Cal.Rptr. 385, 421 P.2d 393].) 'In such a test,' the court reasoned, 'the speaker is asked, not to communicate *ideas or knowledge of facts,* but to engage in the physiological processes necessary to produce a series of articulated sounds, the *verbal meanings of which are unimportant.*' ([Citation], italics added.) By contrast, the court observed, a lie detector test would be 'essentially testimonial' because it is 'designed to probe the conscious knowledge of the accused.' [Citation.] . . .

"Shortly after this court's decision in *Ellis,* the Supreme Court handed down its decisions in the companion cases of *United States* v. *Wade, supra,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], and *Gilbert* v. *California, supra,* 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]. There, the federal privilege was deemed not to have been violated when a person accused of a criminal offense was required to participate in a lineup (*Wade*), speak designated words (*Wade*), or give a handwriting exemplar (*Gilbert*). In reaching these conclusions, the court relied on the fact that the accused had not been required to 'disclose *any knowledge* that he might have' (388 U.S. at p. 222 [18 L.Ed.2d at p. 1155], italics added.) or to otherwise communicate information." (*People* v. *Rucker, supra,* 26 Cal.3d at pp. 381-382; see *Com.* v. *Hughes, supra,* 404 N.E.2d at pp. 1242-1243.)

The *Hughes* court added *Fisher* v. *United States* (1976) 425 U.S. 391 [48 L.Ed.2d 39, 96 S.Ct. 1569], a case involving the compelled production of documents from one other than the writer, to the discussion. (*Com.* v. *Hughes, supra,* 404 N.E.2d at p. 1243.) On its particular facts, *Fisher* held that compelled production did not infringe upon the privilege against self-incrimination.[7]

*Hughes* analyzed the *Fisher* decision this way: "The [*Fisher*] Court recognized that two kinds of testimonial assertions were implied in the production. First, 'producing the documents tacitly admits their existence and their location in the hands of their possessor.' [Citation.] Second, the production implicitly authenticated the papers as being those requested in the summons. [Citation.] Why, then, was the claim of privilege denied? The elements of existence, location, and control of the papers were 'not in issue'; '[t]he existence and location of the papers are a foregone conclusion and the taxpayer adds little or nothing to the sum total of the Government's information by conceding that he in fact has the papers.' [Citation.] The information added was trivial. In the circumstances, existence and location of the papers were comparable to the existence and location of the blood

---

[7]In *Fisher,* agents of the Internal Revenue Service, after interviewing certain taxpayers regarding possible civil or criminal infractions of the tax laws, learned that these taxpayers had retrieved some of their accountants' work papers (which laid out analyses of the taxpayers' income and disbursements related to the years under investigation), and had passed the papers to their attorneys. Summons was then served on the attorneys to produce the work sheets. Because the client passed the documents to the attorney in a privileged transaction, the court was disposed to analyze the case as if the client had never made the transfer. (*Fisher* v. *United States, supra,* 425 U.S. 391, 396-405 [48 L.Ed.2d 39, 47-52].)

The issue therefore reduced to whether the taxpayers themselves had a Fifth Amendment privilege to refuse production of the papers prepared by their accountants. (See *Com.* v. *Hughes, supra,* 404 N.E.2d at p. 243.)

extracted in *Schmerber.* Coming to the element of authentication, the Court said that, while testimonial, it did not incriminate the taxpayer: the implicit assertion that the papers produced conformed to the summons would not serve to authenticate them at trial; it was the testimony of the accountants that would do that. Nor was the government using the taxpayer's 'authentication' to prove that the figures were accurate. [Citation.]" (404 N.E.2d at p. 1243.)

The *Hughes* court then reasoned that "The converse inference from *Fisher,* . . . is that assertions implied from production of things (whether or not documents) are within the Fifth Amendment, and thus justify the refusal to produce, when they are nontrivial and incriminating." (*Com.* v. *Hughes, supra,* 404 N.E.2d at p. 1243.)[8]

Foundation laid, the *Hughes* court turned to the question of the testimonial nature of the act of producing the pistol sought by the prosecution in that case: "If the defendant should produce the revolver, he would be making implicitly a statement about its existence, location and control to which the Commonwealth says it would allude at trial to show he had possession and control at some point after the alleged crime. The implied statement would also function as an authentication. [Citations.] Nor would the statement amount to a 'foregone conclusion' conveying merely trivial new knowledge. On the contrary, it would deal with just those matters about which the

---

[8]*Hughes* then cites cases, both preceding and following *Fisher,* which used some form of the *Fisher* implied assertion principle to protect against compelled or coerced discovery: *United States* v. *Campos-Serrano* (7th Cir. 1970) 430 F.2d 173 (alien registration receipt card in possession of defendant); *United States* v. *Plesons* (8th Cir. 1977) 560 F.2d 890 (physician's medical records); *In re Bernstein* (S.D.Fla. 1977) 425 F.Supp. 37 (tape recordings of telephone conversations); *Matter of Grand Jury Subpoena Duces Tecum* (S.D.N.Y. 1979) 466 F.Supp. 325 (records received from certain named individuals reflecting monies paid or lent to or received from named individuals); *State* v. *Dennis* (1976) 16 Wn.App. 417 [558 P.2d 297] (hidden cocaine); *State* v. *Alexander* (Minn. 1979) 281 N.W.2d 349 (allegedly obscene movie).

After our opinion was filed in this case, the United States Supreme Court rendered its decision in *United States* v. *Doe* (1984) — U.S. — [79 L.Ed.2d 552, 104 S.Ct. 1237]. We have therefore modified our opinion to reflect that decision in this footnote. In *Doe,* the high court applied the compelled tacit admission theory of *Fisher* and held that a government subpoena directing a sole proprietor to produce his business records before a grand jury violated his Fifth Amendment privilege against self-incrimination. All nine justices agreed that the act of producing the documents would involve testimonial self-incrimination because it tacitly admits that the records exist, that they were in the suspect's possession and that they are authentic. In the absence of a showing by the government that the possession, existence and authentication of the documents were a "foregone conclusion," the act of producing the documents was privileged and could not be compelled without a statutory grant of immunity. The *Doe* decision thus confirms the correctness of the legal reasoning in *Hughes* and in this case.

Commonwealth desires but does not have solid information. A search warrant has proved futile. Apparently the Commonwealth does not know whether the gun exists or, if it does, where it is being kept; it has only some evidence to base a suspicion that the defendant may be able to produce it, if he will. In the language of the cases, the Commonwealth is seeking to be relieved of its ignorance or uncertainty by trying to get itself 'informed of knowledge the defendant possesses.' [Citation.]" (*Com.* v. *Hughes, supra,* 404 N.E.2d at p. 1244.)[9]

There is only one minor factual difference between *Hughes* and the present case. In *Hughes,* as is made clear by the preceding quotation, the authorities had obtained a warrant to search defendant's car for a pistol and spent shells. (*Id.,* at p. 1240.) When the police executed the warrant, nothing was found. The order to produce the weapon followed. (*Ibid.*) In contrast, the record here is silent as to whether a search warrant was unsuccessfully executed or was even sought. Be that as it may, the prosecution here as in *Hughes* was simply using court ordered disclosure to relieve itself of its "ignorance or uncertainty by trying to get itself 'informed of knowledge the defendant possesses.' " (*Id.,* at p. 1244.)

Moreover, we note that, like *Hughes,* the prosecution here did not volunteer to limit the use at trial of the fact that defendant produced the gun. The prosecutor could use the fact of defendant's production as evidence that he had possession and control of the weapon after the attempted murder and assault.

Finally, and crucially, here, as in *Hughes,* the existence, location, and control of the gun are not a "foregone conclusion." Unlike the ordered disclosure in *Fisher,* here the act of defendant producing the gun whose whereabouts is unknown would reveal personal knowledge possessed by defendant and not otherwise available to the prosecution.

We are convinced that the reasoning of *Hughes* is sound. We therefore join that court in holding that the compelled production of a weapon, alleg-

---

[9]We note the similarity of the test applied to pretrial interviews in *People* v. *Rucker, supra,* 26 Cal.3d at page 382: "Clearly, the responses made by appellant were 'communications' on their face for he was asked to 'communicate ideas or knowledge of facts.' The words appellant spoke were not prescribed for him, as in *Wade.* Rather, he was required to 'disclose knowledge' and to reveal 'privately held information.' "

edly used to commit the crimes charged, is a testimonial communication within the meaning of the privilege against self-incrimination.

Next, we turn to the question whether the production of the gun would be incriminating. We cannot conceive how it could be otherwise. The *Hughes* court explained why production of a yet unlocated weapon is incriminating: "The revolver is the supposed instrumentality of the crime, and control or possession after the event, taken together with the earlier ownership attested by the registration, would tend to establish possession at the critical time. It is partially on this declared theory that the Commonwealth has pursued the defendant with its motion to produce. The Commonwealth states that once it has the revolver in hand, it will run ballistics tests, and these may lead to expert testimony, of whatever strength, tying the revolver to the actual assault. This is a step beyond the production sought, but the constitutional privilege 'does not merely encompass evidence which may lead to criminal conviction, but includes information which would furnish a link in the chain of evidence that could lead to prosecution . . . .' [Citations.][10] In reviewing the contempt adjudication, it is right to assume, as the defendant does arguendo in his brief, that he has present possession of the registered gun, which makes very real the factor of self-incrimination that is involved.[11] [Citation.]" (*Id.*, at p. 1245; fn. omitted.)

Again, only insignificant factual differences distinguish *Hughes* on this point. In *Hughes,* defendant had apparently owned the gun, as attested by the registration. Here, according to the deputy district attorney, the police had obtained a "dealer's record of sale" showing that defendant's wife had purchased the weapon identified as a Smith and Wesson, model 59, serial #A399883, 9mm pistol. The police, it is asserted, had additional information connecting defendant with the gun: defendant's son told police that defendant had taken the gun prior to the shooting; on the day of the shooting defendant spoke with police by telephone and indicated that he was going to retrieve the gun from where he had put it; and several months after the

---

[10]As we have noted, the California formulation of the privilege against self-incrimination, *in the context of pretrial prosecutorial discovery, as enunciated in Prudhomme v. Superior Court* (1970) 2 Cal.3d 320, 326 [85 Cal.Rptr. 129, 466 P.2d 673], is nearly identical.

[11]In a footnote at this point, the court noted that if defendant Hughes failed to produce the gun on request, he might be criminally liable under Massachusetts general law. (*Com.* v. *Hughes, supra,* 404 N.E.2d at p. 1245, fn. 12.)

In the instant case, the court imposed evidentiary sanctions on defendant for his failure to produce the weapon. Presumably, defendant here could also have been held in criminal contempt under section 166 if the order were valid.

shooting defendant informed a police detective that he had a 9mm automatic in his car. As clearly as in *Hughes,* the prosecution's access to and use of the gun at trial would go a long way to establishing defendant's possession of the gun at the critical time.[12]

In *Hughes,* once the gun was produced, the prosecution was going to run ballistics tests in an attempt to tie the revolver to the assault. Here, the court ordered that the gun be produced "for inspection, examination, and testing." Presumably, the prosecution here would also use evidence derived from the weapon to establish defendant's guilt for the crimes charged.

The argument for finding that production of the weapon would be incriminating is compelling: no reasonable person could doubt that the weapon itself could serve as a "'link in a chain' of evidence tending to establish guilt of a criminal offense." (*Prudhomme* v. *Superior Court, supra,* 2 Cal.3d at p. 326.) Again, we join the *Hughes* court.

We address one last issue, namely, whether the restrictions in the discovery order—defendant was not required to provide the prosecution with any information, statements, or discovery of any kind, nor identify the source, prior location or previous testing or examination of the pistol—cured the order.

We have already covered this territory: First, the act itself of producing the gun, without more, has strong testimonial aspects. Second, the gun alone, without more may produce incriminating evidence. Based on these two facts, the order's apparent respect for defendant's testimonial privilege *after* he produces the gun is too little, too late. It is essentially window dressing, albeit transparent, for a blatant constitutional invasion.

---

[12]Implicit in the prosecution's position, and the court's order, is the argument that independent evidence establishes defendant's possession of the gun at the time of the offense and after. The *Hughes* court addressed the same argument: "The Commonwealth does not simply assert that the evidence to be gained by production is here inconsequential or nonincriminating; rather it says that the evidence is unworthy of Fifth Amendment protection because it merely enhances other persuasive evidence obtained without the defendant's help. The Commonwealth's argument is indeed curious. It is as if we were asked to rule that a confession could be coerced from an accused as soon as the government announced (or was able to show) that [in] a future trial it could produce enough independent evidence to get past a motion for a directed verdict of acquittal. This would be to encourage present infringements of the Constitution on the excuse that they might or would be held 'harmless' after trial and conviction." (*Com.* v. *Hughes, supra,* 404 N.E.2d at p. 1245.)

We also note that here, as in *Hughes,* the prosecution has *not* attempted to eliminate, as far as it could, the testimonial aspects of defendant's production of the gun. The prosecution could have undertaken to authenticate the gun at trial using only the serial number and assured that at trial it would not tender the fact that defendant produced the gun. (*Com.* v. *Hughes, supra,* 404 N.E.2d at p. 1245.) Even with these expedients, the *Hughes* court expressed doubts whether its decision would have been different.[13] (*Ibid.*) We join in those misgivings. First, the presentation of a gun to a jury in and of itself speaks loudly. Second, "[i]mplicit statements as to existence, location, and control would nevertheless have been compelled and the information would have been delivered over to the Commonwealth. The Commonwealth could use such information, mediately, to secure other incriminating evidence to put before the jury, and it can be assumed that the testimonial statement as to the location of the gun would be used, mediately, to lead to ballistics tests and ballistics evidence and an opinion thereon." (*Com.* v. *Hughes, supra,* 404 N.E.2d at pp. 1245-1246.) In sum, insulating the trier of fact from information concerning the source of the weapon would not necessarily alter the fundamentally testimonial, and incriminating, aspect of the compelled production of the weapon.

Since the discovery order to produce the pistol lightens the prosecution's burden and would serve as an evidentiary link in the chain of guilt, it violates defendant's constitutional privilege against self-incrimination. The order is therefore beyond the court's jurisdiction, and is void and unenforceable.

---

[13] *Hughes* cites two cases for comparison. The first, *United States* v. *Authement* (5th Cir. 1979) 607 F.2d 1129, held that the production of brass knuckles in response to a subpoena duces tecum did not violate defendant's privilege against self-incrimination because, even though it showed the knuckles existed, were the ones carried at the time of the assault, and were in defendant's possession at the time of the subpoena, the testimonial communication (i.e., the production of the brass knuckles) was never used against defendant at trial. (*Id.,* at p. 132.) Defendant did not testify at trial; the fact that defendant's attorney produced the knuckles was never revealed to the jury; the knuckles were identified and authenticated by a third party. (*Ibid.*) The second, *Matter of Grand Jury Subpoena Duces Tecum, etc.* (S.D.N.Y. 1979) 466 F.Supp. 325, 327, held that compelled production by the target of two grand jury investigations of all records received from certain individuals involved testimonial self-incrimination. The court observed that unlike *Fisher,* where the existence of the documents in question was a "foregone conclusion," the concession that the person under investigation possessed the records added everything to the case. (*Ibid.*) The court then opined that withholding the source of the evidence from the jury would not obviate the damage done by production, stating "This *deus ex machina* approach cannot cure the constitutional infirmities of the subpoena, since the Government attorney would certainly know the source of the documents. Indeed, the Government's suggestion clearly misconstrues its own function. For what is the meaning of the Fifth Amendment if any citizen can be forced to give self-incriminating testimonial evidence to a Government prosecutor with only a vague assertion that the information will be insulated from all others? In my view this production cannot be compelled absent a grant of immunity." (*Ibid.*)

### III

■ The instant petition has been served on respondent court and real party in interest. Opposition has been filed. Under these circumstances, this court is empowered to issue a peremptory writ of mandate without first issuing an alternative writ. (Code Civ. Proc., § 1088; *Central & West Basin Water etc. Dist.* v. *Wong* (1976) 55 Cal.App.3d 191, 196 [127 Cal.Rptr. 448]; *Goodenough* v. *Superior Court* (1971) 18 Cal.App.3d 692, 697 [96 Cal.Rptr. 165].)

Let a peremptory writ of mandate issue directing respondent court to vacate its discovery order requiring defendant and his attorney to produce for inspection the weapon allegedly used in the commission of the crimes with which defendant is charged and to vacate its order providing for sanctions for noncompliance with its discovery order by defendant and/or his attorney. The stay previously issued is vacated effective upon the finality of this opinion.

Puglia, P. J., and Regan, J., concurred.

On March 21, 1984, the opinion was modified to read as printed above.